ALBANY,
January, 1818.

GRISWOLD
*v.*
WADDINGTON.

---

NATHANIEL L. & GEORGE GRISWOLD *against* HENRY &
JOSHUA WADDINGTON.

This was an action of *assumpsit*, on the *capias* in which
the defendant, *Joshua Waddington*, was taken.   The cause
was tried before Mr. J. *Van Ness*, at the *New-York* sittings,
in *November*, 1816.

The defendant, *Joshua Waddington*, was an *American* ci-
tizen residing in *New-York*, and the defendant, *Henry Wad-
dington*, a *British* subject residing in *London*.   The defend-
ants had been in partnership together, and carried on their
business at *London*, under the firm of *Henry Waddington &
Co.*; and at *New-York*, under the firm of *Joshua Waddington
& Co.*   The plaintiffs were citizens of the *United States*, re-
sident in *New-York*, and the demand sought to be recovered
in this action, was a balance of account arising on transac-
tions between the plaintiffs and *Henry Waddington*, or the
firm of *H. Waddington & Co.* during the late war between
this country and *Great Britain*.   Evidence was produced on
the part of the defendants to show that a dissolution of
the partnership between them took place on the 31st of
*December*, 1812, anterior to the transactions in question,
but there was no proof that any public notice of disso-
lution had been given, or that the fact was generally
known, or known to the plaintiffs.   The plaintiffs, to
prove the existence of a partnership, produced an af-
fidavit made by *J. Waddington* in the district court of
the southern district of *New-York*, on the 9th of *March*,
1813, annexed to a petition presented to that court for the

A partnership
between per-
sons residing
in two differ-
ent countries,
for commercial
purposes, is, at
least, suspend-
ed, if not *ipso
facto* determi-
ned, by the
breaking out of
war between
those coun-
tries; as the ef-
fect of a state
of war is, to
render illegal
all intercourse
between the
subjects and
citizens of the
hostile nations.
If such part-
nership expire
by its own li-
mitation dur-
ing the war, the
existence of the
war dispenses
with the neces-
sity of giving
public notice
of the dissolu-
tion.
The death,
insanity, or
bankruptcy of
a partner,
works a disso-
lution of the
partnership.

purpose of obtaining a remission of the forfeiture and penalties incurred by the importation of goods from *England* by *J. Waddington & Co.* in the year 1812, pursuant to the act of congress of the 2d of *January*, 1813, in which he stated, "that the said firm of *J. Waddington & Co.* is composed of this deponent, *H. Waddington*, and *R. S. Newby*, who are all citizens of the *United States*, and that their business is conducted in *Great Britain* by the said *H. Waddington*, who also conducts the firm of *H. Waddington & Co.*; which last mentioned firm is composed of himself and this deponent." It was stated by the attorney who drew the petition and affidavit, that he had no particular instructions from the defendant, *J. Waddington*, and that he had several petitions to prepare at that time, which the parties were anxious to get forward, and which occasioned a great press of business.

The case contained letters, bills of exchange, and accounts, showing the particulars of the transactions on which the claim of the plaintiffs was founded, and evidence offered as to the permission of the government of the *United States* to its citizens to write letters, and to remit bills of exchange to *Great Britain*, during the late war, which was objected to, but admitted; and the evidence of witnesses offered to show the modern practice and usage of nations as to this kind of intercourse, which was objected to, and overruled by the judge. But it is necessary to state those facts only which relate to the points decided by the court.

The jury found a verdict for the plaintiffs, for 17,757 dollars and 9 cents, subject to the opinion of the court, on a case made, with liberty to either party to turn the case into a special verdict, with power to the court to grant a new trial, or a *venire de novo*.

*Griffin*, for the plaintiff. The existence of a copartnership between the defendants, at the time when war intervened between the *United States* and *Great Britain*, will not be denied. (1.) Was that partnership dissolved by the war; or otherwise, before the plaintiff's right of action accrued? There is no legal evidence of a dissolution. The

letters between the partners were not competent evidence of such a fact.    They are not even admissible to support any equitable defence.    This court will not be influenced by equitable considerations.    There is no peculiar hardship in the case, as regards *J. Waddington*.    The plaintiffs had long dealt with the firm, and must have relied much on the credit of the partner here.    A partnership, though dissolved by mutual consent, between the parties, may still exist as it regards third persons, unless some act is done to make known the dissolution to the rest of the world.    The manner in which this is to be done has been much discussed. It is now settled, that there must be a *notice* in the *Gazette* to all the world; and a special notice to all persons who have been in the habit of dealing with the firm.    (*Ketcham* v. *Clark*, 6 *Johns. Rep.* 144.    *Lansing* v. *Gaine & Ten Eyck*, 2 *Johns. Rep.* 300.)    That any such notice has been given, or that there has been a dissolution *de facto*, of the partnership, will not be pretended.    Then the question is, did the intervention of the war, *ipso facto*, and of course, put an end to the co-partnership ?    War, unhappily for mankind, is an event of very frequent occurrence ; but we do not find it mentioned in any adjudged case, or enumerated by any elementary writer, among the causes of a dissolution of the contract of co-partnership.    *Death, bankruptcy, insanity*, decree of a court of equity on the ground of *misconduct* of one of the partners, are the only causes of dissolution mentioned in the books.    If there is not to be found in any volume of reports, nor in any treatise on the law of partnership, in *England, France* or *Holland*, a *dictum* in support of the position that war dissolves this contract, it must be a strong circumstance in support of the claim of the plaintiffs.    " Non-usage," says Lord *Coke*, " where there is no example, is a great intendment that the law will not bear it."    (*Co. Litt.* 81, b.)    Partnerships between citizens of different countries, as between the merchants of *England* and of *Holland*, of *Spain* and *Portugal*, must have been frequent during wars between the respective countries.    The continuance of partnerships between the subjects of two countries, after war has intervened, is recognised in the *English* reports, without any animadversion ; and had they been

deemed unlawful and void, they would not have been passed over without some reprehension. In the case of *M'Connel* v. *Hector*, (3 *Bos. & Pull. Rep.* 113.) in the C. B. (in 1802,) though it was decided that a petition by a *British* subject, resident in *England*, for a partnership debt, where his partners, who were also *British* born subjects, resident in the enemy's country, would not support a commission of bankruptcy, yet there is not the least suggestion that the contract of partnership was unlawful, or had ceased to exist in consequence of the war. In *Fayle* v. *Bourdillon*, (3 *Taunt. Rep.* 546.) the agents who effected a policy of insurance on a licensed voyage, brought an action on the policy, and averred the interest to be in three partners in trade, one of whom resided in *Glasgow*, and the other in the country of the enemy of *Great Britain*. *Shepherd* and *Vaughan*, arguendo, for the plaintiffs, lay down the position, which is not contradicted by the counsel for the defendant, nor by the court, that a *British* subject, though resident in an enemy's country, may still be a subject, for all the purposes of being a partner in a house of trade in *Great Britain*, and of trading, as from that house; as he may be, on the other hand, an alien enemy, so far as he mixes himself with the commercial transactions of a house of trade in an enemy's country; and that the partnership firm in *Great Britain* might lawfully import the goods or insure them, though the same would not be lawful in the partnership firm at *Gothenburgh*.

Again; we find cases of joint shipments, made by one partner residing at home, and the other partner resident abroad, in the enemy's country, where, in case of capture, the share of the partner residing in the enemy's country has been condemned, and the share of the other partner acquitted; thereby recognising a joint or co-partnership interest, existing during the war, between persons, one of whom is in the enemy's country. (The *Citto*, 3 *Rob. Adm. Rep.* 38. The *Francis*, 1 *Gallis' Rep.* 618. per *Story*, J., affirmed on appeal, 8 *Cranch*, 335.) In the case of *The Jonge Klassina*, (5 *Rob. Adm. Rep.* 297.) though not a case of partnership, yet Sir *William Scott* says, that " a man may have mercantile concerns in two countries; and if he acts as a merchant of both, he must be liable to be considered as a

subject of both, with regard to the transactions originating respectively in those countries." Mr. *Ravie*, in that case, had a great manufacturing establishment at *Birmingham*, and had obtained a license to import certain goods from *Holland*, where he had a mercantile establishment, under the firm of *Ravie* & Co. of *Amsterdam*. Though it was held, that the license did not extend to protect shipments in the name of *Ravie* & Co., yet there is not the least suggestion as to the operation of war on such commercial connections in an enemy's country. *Chitty*, in his *Treatise on the Law of Nations*, &c. referring to the cases, lays it down as a general rule, that the maintaining a mercantile connection, or commercial establishment, in a hostile country, merely renders the property, connected with that establishment, liable to seizure ; he does not say that such a connection, or partnership, is illegal, and *ipso facto,* void. In the case of *Ten Eyck* v. *Seaman*, as decided in the court of chancery, on the 31st day of *July*, 1799, Chancellor *Livingston* held, that the war (of 1776) between *Great Britain* and the *United States*, did not dissolve the partnership, and decreed that *Seaman* should account to his partner, *Ten Eyck ;* and this decree was never reversed. (The counsel read a MS. note of the case.)

Again ; the defendants, notwithstanding the intervention of the war, elected to continue their partnership, at all events, to *January*, 1813 ; and the affidavit of *H. W.*, made in *March*, 1813, shows, in addition to the letters, that the partnership was still subsisting. This written declaration, under the oath of the party, is the highest possible evidence of the fact. It is stronger even than that of a record. There cannot, then, be the slightest doubt of the continuance of the partnership, and the want of any advertisement or notice of its dissolution, is additional evidence of its continuance.

Does a war, then, *vi et armis*, dissolve a partnership which the parties have agreed shall continue, notwithstanding the war ? If the war has that operation, it must be either to protect the interest of the individual citizen, or from principles of public policy. Individuals are the best judges of their own interests, and if they elect to continue such a connection, there is no reason for compelling them to dis-

ALBANY,
January, 1818.

GRISWOLD
v.
WADDINGTON.

solve it.   On what principle of public policy is such a con-
tract to be destroyed ?   Public policy may demand a prohi-
bition of all trade with the enemy.   It may forbid inter-
course.   But if partners elect to continue their connec-
tion, under all the disadvantages of a state of war, and sub-
ject to all the consequences which may arise, in case of a
violation of the allegiance they owe to their respective coun-
tries, why may they not be permitted to take the chance of
war, and share the eventual profit or loss ?   Private contracts,
especially those of partnership, are solemn things, and
though private rights must yield to public necessity, yet
that necessity must be of the most imperious nature.   Com-
mercial intercourse between nations, of which partnerships
form important links, has a most powerful influence in soft-
ening the asperities and mitigating the evils of war, that
greatest of all human calamities.   All commercial inter-
course that does not interfere with belligerent rights, and
which must, of necessity, be extremely limited, ought to be
tolerated, notwithstanding the war.   And the evidence in
this case, shows that our government have allowed letters
and bills of exchange to be remitted to *British* subjects,
during the war.   Many practices, formerly deemed lawful
in war, have been abrogated, as cruel and inconsistent with
the manners of a more enlightened and civilized age.   It is
true, that *Bynkershoeck*, in his treatise, advocates the rights
of war, in all their extent.   It is a treatise by the hand of a
master, but, like the laws of *Draco*, it is written in blood.
With that writer, every thing is lawful against an enemy ;
the use of poison, fraud, and deceit of every kind.   He ad-
mits, that the conqueror has the power of life and death
over the vanquished ; may put his prisoners to death, or re-
duce them to slavery.   *Vattel* and *Martens* are of a contrary
opinion.   Lord Ch. J. *Eyre*, in *Sparenburgh* v. *Bamsatyne*,
(1 *Bos. & Pull.* 170.) says, " Modern civilization has intro-
duced great qualifications to soften the rigours of war ; and
allows a degree of intercourse with enemies, and particu-
larly with prisoners, which can hardly be carried on with-
out the assistance of our courts of justice.   It is not, there-
fore, good policy to encourage those strict notions which
are insisted on, contrary to morality and public conveni-

ence." In *Clark* v. *Morey*, (10 *Johns. Rep.* 69.) *Kent*, Ch. J. says, " the rigour of the old rules of war no longer exists, as *Bynkershoeck* admits, when wars are carried on with the moderation which the influence of commerce inspires." Again ; " since the time of *Grotius*, continued and successful efforts have been made to strengthen justice, to restrain the intemperance of war, and to promote the intercourse and happiness of mankind." It will, perhaps, be said, on the other side, that to allow this commercial intercourse, relaxes the sinews of war, diminishes patriotism, and encourages or facilitates traitorous correspondence with the enemy. But what harm can result from a partnership between a manufacturer of *Birmingham*, and another in *Pennsylvania* ; or between a farmer of *Devonshire*, and one in *Massachusetts ?* Does war dissolve all kinds of co-partnership, between the subjects of belligerent powers ? Does it suspend or destroy the matrimonial contract ? Cannot a husband correspond with, or afford support to his wife, residing in the country of his enemy ?

Again, it will be said, all *trade* with an enemy is unlawful. Trading with an enemy consists, (1st.) in *buying* from an enemy, as in *Potts* v. *Bell*, (8 *Term. Rep.* 548.) and the *Hoop*, (1 *Rob. Adm. Rep.* 165.) (2d.) In *selling* to an enemy, as in 2 *Roll. Abr.* 173. referred to by Lord *Mansfield*, in *Gist* v. *Mason*, (1 *Term. Rep.* 84.) who says, he knew of no case which prohibited even a subject from trading with the enemy, except two, the short note in *Roll. Ab.* and a case referred to by Lord *Hardwicke* in King *William's* time, of carrying corn to the enemy. In *Henkle* v. *Royal Exchange Assurance Company*, (1 *Vesey*, 320.) Lord *Hardwicke* says, " no determination has been, that insurance on enemies ships during the war is unlawful ; it might be going too far to say, all trading with enemies is unlawful."

(3.) Where the trade is such as necessarily leads to personal intercourse, as in the case of the *Rapid*, (1 *Gallis. Rep.* 295.) and the *St. Lawrence*, (1 *Gallis. Rep.* 467.) where the vessels were fitted out here, and sent to the enemy's country. But a partnership may exist, without any buying from, or selling to an enemy, or even without any epistolary or personal intercourse whatever between the

ALBANY,
January, 1818.

GRISWOLD
v.
WADDINGTON.

parties during war, if they have sufficient confidence in each other.

Again, it will be said, that no *contract* can be lawfully made with an enemy. There is a wide difference between saying, after war has commenced, that no contract shall be entered into with an enemy, and dissolving a contract already existing. Suppose the case of landlord and tenant; an *Englishman* holding land in this state, under an act of our legislature, which he has leased. Does not the contract continue? Does not *rent accrue* to the lessor, during war, though the right of action to enforce the payment of it is suspended? (*Bradwell* v. *Weeks,* 1 *Johns. Ch. Rep.* 206, 208.) An alien enemy, who is compelled to leave the country, may appoint an attorney to act in his name, and to collect debts due to him anterior to the war. (1 *Emerigon,* 567. *Clark* v. *Morey,* 10 *Johns. Rep.* 69. *Bell* v. *Chapman, ibid.* 183.) The power of attorney is not revoked by the war; and an agent so appointed, may sell the property of his principal and convert it into money. If an alien enemy may lawfully have an attorney or agent to act for him, why may he not have a partner? The 10th article of the treaty of the 19th *November,* 1795, (2 *U. S. L.* 476.) between *Great Britain* and the *United States,* declares, that neither the debts due to individuals of the two countries, respectively, nor monies in the public funds, nor in public or private banks, shall, in the event of war, be sequestered or confiscated, " it being unjust and impolitic, that debts and engagements, contracted and made by individuals having confidence in each other, and in their respective governments, should ever be destroyed or *impaired* by national authority, on account of national differences." This is declaratory of the sense of the two nations of the modern law on the subject: it is one of the permanent articles of the treaty; and being prospective, and intended to have its operation in all future wars, it was not abrogated by the intervention of the late war. (*Vattel,* B. 3. ch. 10. s. 175. *Levine* v. *Taylor,* 12 *Mass. Rep.* 8, 10.) Suppose the defendants to be bankers, keeping their banking house in *London,* the shares of *J. W.* in such house, could not be sequestered or confiscated. His share of the accruing profits of the business, could not

be forfeited, nor impaired by the war, and after the restora- <span>ALBANY,</span>
tion of peace, he might file his bill in the *English* court of <span>January, 1818.</span>
chancery for his share of the profits, which would be decreed <span>GRISWOLD</span>
to be paid to him, as was done by Ch. *Livingston*, in the <span>v.</span>
<span>WADDINGTON.</span>
case of *Ten Eyck* v. *Seaman.* As it regards this case, the
defendants were mere bankers; they received the money of
the plaintiff on deposit. The claims of *J. W.* to his share
of profits, and his liabilities, it is true, remain suspended,
during the war; but they revive in full force, on the return
of peace. The same treaty of 1794, (art 26.) provides,
that in case of rupture between the two nations, " the mer-
chants and others of each nation, residing in the dominions
of the other, shall have the privilege of remaining and conti-
nuing their trade so long as they behave peaceably, and com-
mit no offence against the laws." " And in case the respec-
tive governments should think proper to order them to re-
move, twelve months are allowed for that purpose, for their
removal with their families, effects and property." This
article, though not permanent, shows the great melioration
of the practice of nations in war, under the influence of su-
perior civilization.

2. Was there any illegality in the transactions, in regard
to the contract on which this action is founded, which ought
to defeat the plaintiff's recovery ? This is a most ungracious
defence on the part of any debtor. It was not unlawful
for the plaintiffs to direct their funds to be placed in the
hands of the defendants, or to remit bills to them, for the
purpose of being collected. The *gist* of the action, is to
recover money received by the defendants, to the use of the
plaintiffs. (Here the counsel entered into an examination
of the particulars of the transaction, the facts and arguments
as to which it is not thought necessary to state, as they were
not taken notice of by the court.) The following cases were
cited : the *Samuel*, 4 *Rob. Adm. Rep.* 233, in note. 2 *Hen. Bl.*
378. 11 *East*, 265. 3 *Bos. & Pull.* 335. 1 *Campb. N. P.*
*Rep.* 65. 3 *Campb. N. P. Rep.* 303. 1 *Bos. & Pull.* 170, 171.
345. 353. 8 *Term Rep.* 562. 4 *Burr.* 2069. 1 *Wm. Bl.*
633. 2 *Gallison's Rep.* 210. 3 *Johns. Cases* 130. 3 *Term*
*Rep.* 418. 454. 5 *Taunt.* 181. *Cowper*, 341.

ALBANY,          3. The judge on the trial, admitted improper evidence,
January, 1818.  and rejected proper testimony.

GRISWOLD          *Wells* and *T. A. Emmet*, contra.   (1.) War, by that state
v.              of things which it necessarily produces, *ipso facto*, dissolved
WADDINGTON.     the contract of partnership.  A partnership implies the
joint exercise of labour and skill, as well as the joint em-
ployment of capital, in a lawful trade or business.   This
contract may be dissolved by its own limitation, or the
terms on which it was created; by mutual consent; by an
act inconsistent with the partnership, or by the operation of
law, or the happening of certain events.  Wherever the joint
skill and labour which were to be exercised, or the funds
that were to be used, for the mutual benefit of the partners,
can no longer be so employed, it follows, from principles of
natural justice, that the partnership is at an end.   " Part-
nership," says *Domat*, (B. 1. *Tit.* 8. sect. 5. n. 10.) " whe-
ther universal or partial, may be dissolved,"—" not only
by the express consent of all the partners, but tacitly, as if
the commerce in which they dealt happens to be prohibit-
ed."  " So, of a partnership, the commerce of which ceases
to be free, as if the partnership was for the farm of some
lands, taken by the  enemy in time of war."   (*Ibid.* n. 11.)
Where a partnership is dissolved by the operation of law,
or by events over which the parties have no control, no
notice of that dissolution is necessary.   Thus the *death*,
*bankruptcy*, or *lunacy* of one partner, dissolves the contract.
In case of death or lunacy, the skill and labour of the de-
ceased, or insane partner, is taken away by the visitation of
heaven.  In the case of bankruptcy, the joint fund is sever-
ed, and can no longer be employed for the joint benefit of
the partners.  So, a voluntary assignment by one partner
of his interest, produces the same effect.   In all these cases,
the law works a dissolution, and where it does so, it is legal
notice to all the world.   The other partner is not bound to
give any notice of the event which has produced such dis-
solution.   The principle which results from this view of the
contract is, that wherever a *state of things* occurs, incon-
sistent with the relative rights and duties of the parties,
there is an end to the contract.   Wherever, therefore, by
operation of law, partners cannot, consistently with their

duty, or from physical incapacity, contribute their mutual skill and labour for their common benefit, the contract necessarily ceases to exist.   *War* puts an end to the contract, because all intercourse, at least of a commercial kind, is prohibited.   All trading with an enemy, without the license or permission of the government, is unlawful.   Constant or frequent intercourse between the parties, is essential to the due management of their joint concerns.   The intimate and close connection which subsists, requires a concert of views, a constant mutual intelligence, co-operation, and communication.   During war, almost all commercial business, to be carried on with safety or success, demands correct information, not only as to the state of markets, but as to political measures and events, and the operations of war.   The sole and exclusive object of a commercial partnership, being trade, the intercourse between the partners must be for the purposes of trade.   If trade with an enemy is unlawful, every thing subservient to that object, must be also unlawful.   If the end and the means are both illegal, the contract cannot legally exist.

That all trade, or commercial intercourse between belligerents, is unlawful, we shall show, (1.) from the public law of nations ; (2.) from the maritime law of *England ;* (3.) from the common law of *England ;* (4.) from the law of the *United States*, as settled by the highest tribunals of the country. But we shall first answer some authorities cited, and conclusions drawn from them by the counsel for the plaintiffs. In *M`Connel* v. *Hector*, (3 *Bos. & Pull.* 113.) this question, as to the legality of the partnership, did not arise.   The point was, as to the sufficiency of the debt, to support the commission of bankruptcy ; and it is a principle of the bankrupt law, that the commission cannot be supported, unless on a debt which can be sued for in a court of justice.   And the petitioning creditor, being one of three partners, two of whom resided in the enemy's country, could not maintain an action during war.   In *Fayle* v. *Bourdillon*, (3 *Taunt.* 546.) the position relied on is merely the argument or opinion of counsel ; it was a mere question about a *license.*  In the case of the *Citto*, the voyage was from a *Spanish* port to *Guernsey*, in 1796, and Mr. *Bowden's* part of the cargo was con-

ALBANY,
January, 1818.

GRISWOLD
v.
WADDINGTON.

demned, because he resided in *Holland.* The *Jonge Klassina* was also a *license* case, and though *Ravie's* residence was at *Amsterdam,* yet the property being shipped by him from *Holland,* as a *Dutch* merchant, was condemned. As to the case of *Ten Eyck* v. *Seaman,* there being no report, nor any authentic account of it, it is impossible to know the extent of its authority. *Emerigon,* and the case of *Clark* v. *Morey,* and *Bell* v. *Chapman,* go no further than to say, that when, after war breaks out, a subject of one of the belligerent powers, is compelled to leave the country of the other, he may leave a power of attorney, to take care of the effects he may leave behind, and to collect debts then due. In the case of the *Francis,* (8 *Cranch,* 335.) the goods were shipped in *Scotland,* before knowledge of the war, by a house of trade there, to a house in this country, and though proof of *American* property was offered, the goods were condemned.

That trading with an enemy is unlawful, is a principle to be found in the writings of every publicist. (*Grotius,* lib. 3. ch. 4. s. 8. *Vattel,* lib. 3. ch. 5. s. 69, 70. *Bynk. Quest. Jur. Pub.* ch. 3. *Mably, Droit Public de l'Europe,* tom. 6. p. 356. ch. 11. div. 12.) *Bynkershoeck* is clear and explicit on this point. "There can be no doubt," says he, "but that, from the nature of war itself, all commercial intercourse ceases between enemies." Again; "although trading with the enemy be not specially prohibited, yet it is forbidden by the mere operation of the law of war." (*Valin. liv.* 3. *tit.* 6. *Art.* 3. *Le Guidon,* ch. 2. s. 5. *Pothier, Trait. des. Ass.* n. 92.) The same principle is to be found in the maritime and commercial law of *England.* (*Marsh. on Insurance,* 32. 85. *Parke on Insurance,* 314, 315, 316. *The Hoop,* 1 *Rob. Adm. Rep.* 196.) Sir *William Scott,* in the case of the *Hoop,* lays it down as a principle, to be found in the law of almost every country of *Europe,* "that all trading with a public enemy, unless with the permission of the sovereign, is interdicted."

Again; in the case of the *Cosmopolite,* (4 *Rob. Adm. Rep.* 10.) he says, "It is perfectly well known, that by war, all communication between subjects of the belligerent coun-

tries must be suspended, and that no intercourse can legally be carried on between the subjects of the hostile states, but by the special license of their respective governments." War, in its very nature, is a state of violence. It is an exertion of force against force. It is inconsistent with those speculative notions of modern refinement, that would make enmity and friendship, war and peace, co-existent between the same persons. If war is justifiable, it is a right of destruction ; and, as long as it endures, the rule, which cuts off all commercial intercourse between enemies, must be its law.

Again ; trading with an enemy was, at an early period, an indictable offence, in the *English* court of admiralty. (*Cosmopolite*, 4 *Rob.* 10, 11. in note. *Bl. B.* p. 76.) Thus, trading with *Scotland*, in 13 *Edw.* 2. though under a license from the guardians or keepers of the *truce*, was held an offence, and the license void. (16 *Vin. Ab.* 599. *Prerog. L. a.* pl. 3.) And, in King *William's* time, it was held to be a misdemeanour at common law, to carry corn to the enemy in time of war. (1 *Term Rep.* 85. *Gist* v. *Mason.*) There is not an elementary writer, who suggests a different doctrine. The Abbé *Mably* himself, while he reprobates the severity of the rule, admits it to be the general law. Against all these authorities are cited some loose observations of Lord *Hardwicke*, and Lord *Mansfield*. We are disposed to respect even the errors of those great men ; but, in fact, they have not expressed the opinions imputed to them. They may have had doubts, whether it was not *good policy* to tolerate some intercourse with the enemy, and, principally, insurances of enemy's property. In 1748, Lord *Mansfield*, when solicitor general, advocated this *policy* in parliament ; but he did not attempt to defend its *legality*. Parliament, however, thought differently ; and passed an act, (21 *Geo.* 2. ch. 4.) declaring such insurances void, and annexing certain penalties. The act was *declaratory*, and the penalties cumulative, and, being temporary, expired with the peace of *Aix la Chapelle*, in 1748. In the war of 1756, which terminated in the treaty of *Paris*, 1763, and, during the *American* war, there was no act existing ; but it was revived in 1793, (33 *Geo.* III. ch. 27.) and is *declaratory*, superadding certain penalties. Trading with an enemy

ALBANY,
January, 1818.

GRISWOLD
v.
WADDINGTON.

ALBANY,
January, 1818.

GRISWOLD
v.
WADDINGTON.

is not a statute offence, but is a misdemeanour at com-
mon law. Lord *Mansfield,* when he came to the *bench,* in
1756, brought with him his peculiar notions, as to the *po-
licy* of tolerating the practice of insuring enemy's property.
This opinion of his lordship, as to the *policy* of allowing a
trade with the enemy, or insuring enemy's property, has
been mistaken for his opinion as to *the law ;* and the lustre
of his talents, and his ascendancy in the court of *King's
Bench,* were calculated to continue the delusion. During
his time, the question, as to the *legality* of such insurances,
was never agitated ; for he frowned on every attempt to set
up the illegality as a defence, which he considered as dis-
honest, and against good faith. (Per *Buller,* J. 1 *Bos. &
Pull.* 354. *Bell* v. *Gilson.*) And such was the deference
paid to his known opinions on the subject, that no one pre-
sumed to raise the objection. He put it altogether on the
ground of *expediency,* and its being for the *interest* of *Great
Britain.* He never ventured to reason on the *legality* of the
practice. It was not until after his death, that this question
was raised. (Here the counsel went into a critical examina-
tion of all the cases decided in the *English* courts. *Thelus-
son* v. *Fletcher,* Doug. 315. *Bernon* v. *Woodbridge, Id.* 781.
*Planche* v. *Fletcher, Id.* 251. *Anther* v. *Fisher, Id.* 648.
*note. Gist* v. *Mason,* 1 *Term Rep.* 84. *Bell* v. *Gibson,* 1
*Bos. & Pull.* 354. *Potts* v. *Bell,* 8 *Term Rep.* 548. *Bris-
low* v. *Towers,* 6 *Term Rep.* 35. *Brandon* v. *Nesbett,* 6 *Term
Rep.* 23. *Furtado* v. *Rogers,* 3 *Bos. & Pull.* 191. *Killner*
v. *Mesurier, Id.* 407. *Brandon* v. *Curling, Id.* 410. *Lub-
bock* v. *Potts,* 7 *East,* 449.) In *Potts* v. *Bell,* Lord *Kenyon,*
speaking of the very learned and luminous argument of Sir
*John Nicholl,* in that cause, says, " that the reasons which
he had urged, and the authorities he had cited, were so
many, so uniform, and so conclusive, to show, that a *British*
subject's trading with an enemy was illegal, that the ques-
tion might be considered as finally at rest." " That it was
now taken for granted, that it was a principle of the com-
mon law, that trading with an enemy, without the king's li-
cense, was illegal in *British* subjects." The doctrines of
the courts are, then, united on the common law principle ;
and the universality of the rule, as understood in *Great Bri-*

tain, can no longer be doubted. (See, also, *Park on Ins.*
16. *Marsh. on Ins.* 31. 43.) In the case *ex parte Boussma-
ker*, (13 *Vesey*, 71.) Lord *Eldon* would not permit an alien
enemy to prove his debt, under a commission of bankruptcy.
"If it had been a debt, arising on a contract with an alien ene-
my, it could not," he said, " possibly stand ; for the contract
would be void. The policy of avoiding contracts with an
enemy was sound and wise." If the plaintiff had applied to
prove his debt, under a commission of bankruptcy, in *Eng-
land*, he would not have been heard. Why should he re-
ceive a different measure of justice here ?

As to the law of this state, the express adjudications in
the highest court of our own country, leave no doubt.(*a*) In
the case of the *Julia, Luce*, (8 *Cranch*, 181. 193.) *Story*, J.
in delivering the opinion of the court, lays it down " as a
fundamental proposition, that, strictly speaking, in war, all
intercourse between the subjects and citizens of the belli-
gerent countries is illegal, unless sanctioned by the authori-
ty of government, or in the exercise of the rights of human-
ity." And, he adds, " no contract is considered as valid
between enemies, at least so far as to give them a remedy
in the courts of either government." " Nor is there any
difference between a direct intercourse between the enemy
countries, and an intercourse through the medium of a neu-
tral port. The latter is as strictly prohibited as the former."
(*S. P. The Aurora*, 8 *Cranch*, 203. *The Sally, Porter*, 381. *The
Lawrence, Webb, Id.* 434. *The Joseph, Sargeant*, 451. *The
Venus, Id.* 253.)

If any case could exist in which the general principle of
the law could be relaxed, it was that of the *Rapid ;* (8
*Cranch*, 155.) yet *Johnson*, J. in delivering the opinion of
the court, lays down the rule, in still stronger and sterner lan-
guage. " In the state of war," says he, " nation is known
to nation only by their armed exterior ; each threatening
the other with conquest or annihilation. The individuals
who compose the belligerent states, exist, as to each other,
in a state of utter occlusion. If they meet, it is only in
combat." This doctrine, he says, is supported by the re-

(*a*) Vide *Amory* v *M'Gregor*, ante p. 24.—34. per *Thompson*, Ch. J.

cords of appeals in prize courts, established during the re-volutionary war. "Certain it is, that it was the law of England, before the revolution, and, therefore, constitutes a part of the admiralty and maritime jurisdiction conferred on the court in pursuance of the constitution." "The object, policy, and spirit of the rule is, to cut off all communication, or actual locomotive intercourse, between individuals of the belligerent states. Negotiation, or contract, therefore, has no necessary connection with the offence. *Intercourse*, inconsistent with actual *hostility*, is the offence against which the operation of the rule is directed; and by substituting this definition for that of *trading with an enemy*, an answer is given to the argument." "The ground," says J. *Story*, in the case of the *Rapid*, "upon which a trading with the enemy is prohibited, is not the criminal intentions of the parties engaged in it, or the direct and immediate injury to the state. The principle is extracted from a more enlarged policy, which looks to the general interests of the nation, which may be sacrificed under the temptation of unlimited intercourse, or sold by the cupidity of corrupt avarice." Again; in the *Emulous*, (1 *Gallis. Rep.* 571.) he says, "no principle of national or municipal law is better settled, than that all contracts with an enemy, made during war, are utterly void. This principle has grown hoary under the reverent respect of centuries, and cannot now be shaken, without uprooting the very foundations of national law." These cases clearly show, that the *intercourse* essential to a partnership, cannot be maintained; that it would be criminal. For what purpose, then, can the contract exist? If not for a lawful purpose, it cannot exist at all. How can it continue between parties, whose paramount duties are in direct hostility to each other? There can be no communication between the partners, direct or indirect, oral or written, without the permission of government; and that license can only be for a particular purpose. How, then, could the business of this partnership be carried on? The house of trade was confined to *England*, the enemy's country. - It could not trade with the *United States*. It could not trade with a neutral country, without its property being liable to capture; if by an *American* cruizer, the whole

would be condemned; if by a *British* cruizer, the half, or ALBANY, January, 1818. share of *J. W.* (The *Rugen*, 1 *Wheat. Rep.* 74. The *Julia*, 8 *Cranch*, 181.) Nay, it is the duty of each partner, in the GRISWOLD v. WADDINGTON. event of war, to seize the property of each other, as an enemy, when he meets it on the ocean, if armed with authority for that purpose. The duty they owe to their respective countries forbids the performance of the contract of partnership. ·

Even in the case of a neutral partner in a *hostile house*, his property partaking of the hostile character, must share the fate of the enemy's, and is liable to condemnation as prize. The *trade* may be *hostile*, as well as the persons who carry it on. (The *Vigilantia*, 1 *Rob. Adm. Rep.* 12. case of Mr. *Coopman* referred to. *Susa.* 2 *Rob.* 208. *Portland*, 3 *Rob.* 40. *Jonge Klassina*, 5 *Rob.* 265. The *Antonia. Johanna*, 1 *Wheat.* 168. The *Frances*, 8 *Cranch*, 335.) In the case of the *San Jose Indiano*, (2 *Gallis. Rep.* 268.) J. *Story* adopted the doctrine as laid down by Sir *William Scott*, with the highest approbation; and held that the property of a person may have a hostile character, though he is resident in a neutral country. That a house of trade, established in the enemy's country, rendered the property of all the partners liable to condemnation as prize, though some of them resided in a neutral country. The case of the *Citto* was cited to show, that a court of admiralty would distinguish between the neutral and belligerent property. But the property, in that case, was not shipped from an enemy's country, and the court condemned the property, on the ground of a *domicil*, in the country of the enemy. Now, if this be the effect of a *hostile trade*, upon a neutral; if that makes it the property and trade of an enemy, how can a co-belligerent be concerned in such trade? This strikes at the very foundation of the contract of partnership, *for the trade, to be carried on by the firm, is unlawful.* The case of the *Franklin, Dana,* (6 *Rob. Adm. Rep.* 127.) shows the distinction between the concern of a neutral in a belligerent house of trade, and that of a belligerent in a neutral house. The partnership, as regarded the partner in *England*, was held illegal, because the property was sent to the enemy's country, and his share was condemned, but the share of the partner in *America*, who, being neutral, might lawfully send his pro-

perty to *France*, was restored. The conclusion to be drawn from this case is strong. If the trade, where one partner is belligerent, is unlawful when carried on with his enemy, must not the joint trade, where both partners are belligerents, necessarily be with an enemy ? Both must act unlawfully in carrying on their trade.

Again ; alien enemies are under a further disability ; they cannot sue in the courts of either country. An alien enemy cannot be heard in a court of justice. He has no *persona standi injudicio.* (a) (*Bell* v. *Chapman*, 10 *Johns. Rep.* 183. J. *ex dem Johnston* v. *Decker*, 11 *Johns. Rep.* 418.) In the language of Sir *Wm. Scott*, (*The Hoop.* 1 *Rob.* 201.) " a state in which contracts cannot be enforced, cannot be a state of legal commerce." The partnership contract cannot be enforced in either country ; and the property of the house is liable to seizure in both. Can a partnership legally exist under these disabilities? The incapacity to sue, demonstrates that the contract is unlawful. The disability is co-eval with its existence. It is idle to speak of a contract and of obligations which it imposes, when it cannot lawfully be enforced. There can be no valid contract, without a remedy to enforce it. In *Bradwell* v. *Weeks*, (13 *Johns. Rep.* 1.) the court of errors decided, that an alien enemy can acquire no right, *flagrante bello*, by mere operation of law. But we do not press that decision, because, if we concede that the law has been misunderstood, it does not interfere with the argument. There was no contract, in that case, express or implied. It was a right acquired, if at all, by the mere operation of law, which cast the estate upon the party who happened, at the time, to be an alien enemy, and he might well be allowed to come, after peace was restored, to ask for the property.

This is not like the case of debts contracted before a war, where the capacity to sue was co-eval with the contract, and the remedy is only suspended during war. Here was no remedy existing at the time the contract was made ; and

(a) Vid. *Bynkershoek's Quest. Jur. Pub. Lib.* 1. c. 7. for this form of expression. An enemy cannot *appear* in a court of justice, either as plaintiff or defendant ; figuratively, he cannot have a determinate *character* in court ; alluding to the original meaning of the word *persona* a mask used by actors.

that which had no existence cannot be revived, even by the genial influence of peace. But it is said, that the 10th article of the treaty of 1794, provides for such a case, and saves the right of the party. But we look in vain for such healing efficacy, such a restorative power in that treaty. By the law of nations, the property of an enemy, on the breaking out of war, may be sequestered or confiscated; and *Mr. Pitt*, in 1793, brought a bill into parliament to protect *French* property from the operation of the general law. The object of the framers of the treaty of 1795 was merely to protect *British* property from sequestration or confiscation, in case of a war ; not to legalise a trade during its existence. This court, in *Jackson* v. *Decker*, evidently so understood the treaty. The 26th article had expired, and our government, in fact, did not act on the principle of that article.

2. The partnership was, in fact, dissolved on the 31st of *December*, 1812. It had expired by its own limitation on the 31st of *December*, 1810, but was continued, by agreement, for two years longer. It expired, then, by efflux of time, during a war which superseded the necessity of a public notice, and which, if required, must have been given in *London*, in the enemy's country. Had *H. W.*, in fact, published a notice of the dissolution there, there could have been no ground for this suit; and we contend, that the war rendered such a notice unnecessary. It must have been the joint act of both partners, between whom the war had placed an impassable gulf. But it is said the defendants, afterwards, elected to continue the concern, and the affidavit of *J. W.* of the 9th of *March*, 1813, is adduced as evidence of such consent. That affidavit was made in reference to the time when the goods were purchased in *England* and shipped. At most, it is an accidental mistake, committed in the hurry of business, which ought to produce no injurious consequence. Besides, if the doctrine for which we contend, as to the operation of war on an existing partnership be correct, the parties could not elect to continue the connection during the war. Though you may not find a case in the books in which it has been expressly decided that war puts an end to a contract of partnership, that silence affords no

ALBANY,
January, 1818.

GRISWOLD
v.
WADDINGTON.

argument against the doctrine which is a necessary corollary from the law of nations. The international law does not notice or decide on this particular case. It merely pro- nounces on the character of the individuals, and of their transactions. Elementary writers on the municipal law do not speculate or theorize; they merely digest into sys- tematic form the various adjudications of the courts of law. If no adjudged case is to be found, it is because the parties, like gamesters, relied on their mutual honour, and would not bring their claims before a court of justice.

3. The cause of action arises out of a *trading* with the enemy; and the contract, whether express or implied, is, therefore, void. Personal intercourse is not essential to constitute an illegal trade; nor is buying and selling. In the case of the *Rapid*, there was no personal intercourse or traffick. No matter how, or from whence, the money was sent. It is enough that it was deposited by the plaintiff in the hands of an enemy, without the permission of govern- ment. Remitting a bill of exchange is equivalent to send- ing money. (Here the counsel examined the facts of the case, in regard to the transaction, and remarked on the au- thorities cited to this point.)

*Colden*, in reply. 1. It is said that there can be no con- tract, express or implied, no intercourse whatever, personal or epistolary, between belligerents, without the license of government. This may have been the ancient law of na- tions, the rule of a barbarous age. But it cannot be denied that in modern times the cruel rigours, the inhuman prac- tices of war have much abated, and been greatly softened. This spirit of humanity has extended not only to the treat- ment of prisoners, and to the disposition of the property of the vanquished, but as to intercourse between individuals whose countries are at war. The modern law of nations prohibits only that intercourse which affords aid to the ene- my, or adds to his strength and resources. The illegality of the intercourse with an enemy depends on the nature of it; whether, in the language of the act against treason, you give aid and *comfort* to the enemy. We admit that a *direct* trade with an enemy is unlawful; and that the insurance of

such trade is, also, unlawful and void.  For the sake of ar-
gument, it might, also, be admitted, that there can be no
*express* contract with an enemy ; but it does not, therefore,
follow that there can be no *implied* contract.   The cases of
The *Rapid*, The *Julia*, The *Hiram*, and *Potts* v. *Bell*, were
all cases of a direct trade with an enemy. *Story*, J. in his opi-
nion, (1 *Gallis. Rep.* 308, 309.) refers to the case of the *Hoop*,
and those cited in that of *Potts* v, *Bell*, which are all cases
of a *direct* trade or intercourse.   Not content with these, he
refers back 600 years, to the reign of *Edw.* II. and the *Black
Book* of the admiralty, which he mistranslates.   The words,
" *entrecommunent, vendent, ou achatent*," &c. do not mean
*intercourse* generally, but merely that there can be no com-
mercial intercourse, or interchange, by buying and selling,
without the license of the king or his admiral. He refers, also,
to the *Jonge Pieter*,(4 *Rob.* 79.) where the question was, whe-
ther there was a trading with the enemy ; whether the goods
were shipped by a *British* subject to the enemy, through a neu-
tral country.   *Valin*, (*liv.* 3. *tit.* 6. art. 3.) also, whom he
cites, speaks only of a direct trade, and in prohibited goods ;
and as to the barbarous doctrine of *Bynkershoek*, founded on
the *Roman* law, we have the opinion of an eminent states-
man and jurist of our own country, (*Hamilton ; Camillus*,
No. 20.) that nothing can be more horrid or detestable, and
that if such pretended rights ever did exist as a part of inter-
national law, they have given way to milder and more
equitable usages, which constitute the *customary* law of na-
tions, at the present day.

Lord *Hardwicke*, Lord *Mansfield*, and Lord *Kenyon*, in
their times, were of opinion, that all intercourse with an
enemy was not unlawful ; but that there might be a restrict-
ed intercommunication, and even a trade  to  a  certain
extent.   Such, also, was the opinion of J. *Davis*, in the
case of  the *Hiram*, and of Judge *Peters*, in his charge to
the grand jury in *Pennsylvania*, the 7th of *October*, 1813,
and of Chancellor *Livingston*, in the case of *Ten Eyck* v. *Sea-
man*.   Thus we have the opinions of distinguished judges
and jurists in *Great Britain,* and in our own country, that *some*
species of intercourse with an enemy is lawful.   Because a
direct trade, or an express contract with an enemy, is not

allowed, does it follow that no equitable rights can accrue, nor any obligations arise between individuals whose respective countries are at war? Suppose funds sent forward to *London* before war, but which do not arrive until after war has commenced, does no contract or obligation arise between the person who receives the funds in *England*, and the owner in this country? Can the former be allowed, when called to account, on the restoration of peace, to say, "No : I owe you nothing ; the war dissolved all obligations of justice towards you?" Suppose, also, a remittance made to *England* from a neutral country for the benefit of a citizen of the *United States* during the war : could not the *American* citizen, after the war, maintain an action against the person who received his money in *England*? Good faith is to be observed even with an enemy. (*Grotius*, *lib.* 3. ch. 23. *Puff*. *L.* *N.* b. 8. ch. 7. sect. 16.) *Emerigon*, (1 *Trait. des Ass.* 567.) says, that, at the present day all the sovereigns of *Europe*, for the benefit and security of commerce, have relaxed the rigor of the ancient law, and that a foreigner quitting the country, on the breaking out of war, may leave his power of attorney, to collect his debts. " Les creances que l'Etranger a chez nous, lors de la declaration de guerre, subsistent en leur entier. S'il est forcé de se retirer, il lui est loisible de laisser sa procuration à un ami pour exiger ce qui lui est dû, et *pour actionner ses debiteurs en Justice*." In the case, *ex parte Boussmaker*, which has been cited, would not the foreigner have been allowed, after the war was over, to bring an action for money had and received against the assignees of the bankrupt, for the dividends which had come to their hands? In *Kensington* v. *Inglis*, (8 *East*, 273.) where, under a *license*, goods were imported from *Spain* in an *enemy's* ship, a suit on the policy of insurance was sustained in the name of the *British* subject, though a *trustee* for an enemy. Suppose, after peace, the *Spanish* owner had brought an action against his *English* agent, to recover the amount received by him from the insurers, would the defendant have been allowed to allege that there could be no implied contract, on account of the war? If *all* intercourse was unlawful, if no implied contract, no equitable obligation, could arise during war, that would be a good defence. In *Brad-*

ALBANY,
January, 1818.

GRISWOLD
v.
WADDINGTON.

·well v. *Weeks*, (1 *Johns. Ch. Rep.* 206.) Chancellor *Kent* says, " By the modern law of nations, and by the law of the land, of which the law of nations is also a part, an alien enemy does not forfeit his rights of property. In many cases, he is entitled even to sue for his own rights, as when he is permitted to remain in the country, or is brought here as a prisoner of war, or when, perhaps, he is ordered out of the country, in consequence of the war. He is recognised in our courts, in the character of executor ; (*Brooks* v. *Phillips, Cro. Eliz.* 684.;) and in all cases his property is protected and held in trust for him until the return of peace." Again, he says, " without some special act of the government, an alien enemy is no otherwise affected, in his former capacity, as an alien friend, to hold, acquire, and transmit property, than in the cases to which I have alluded." The plaintiff's claim is founded on a transaction which does not necessarily imply any intercourse with enemies. The fund was in *Antigua*, when war intervened, and was transferred from thence to *London.* This might very well take place without any intercourse. It certainly cannot be criminal intercourse, if it did not aid or comfort the enemy.

Then, does war dissolve a partnership, or merely limit its operations, so far as they may prove prejudicial to belligerent rights ? War, it is true, may give the parties an *election* to dissolve the contract. But if they make such election they must give notice of it, or abide the legal consequence of want of notice. If there is no *election* by either party to dissolve the connection, it must continue limited and restrained to all lawful objects. If the sole object of the partnership was a trade between the two countries, its operations must, of course, be suspended by the intervention of war. In the case put by *Domat*, of a partnership for a particular trade, which becomes unlawful, that destroys the whole subject of the contract. Because war may dissolve a contract of *charter-party*, it does not follow that it puts an end to a partnership. The cases are different. Where the partnership is general, each partner may carry on business in his own country, or with neutral nations, so far as it may be lawful. The business of a partnership may be carried on without any intercourse whatever between

the partners; as where there is an active and a *dormant* partner. Intercourse between partners is not essential or absolutely necessary. It must depend on the nature and objects of the partnership. The parties, it is true, may be subjected to the consequence of being sued, without having the right to sue; but that does not render the partnership illegal. That the partnership did, in fact, exist in 1813, is proved by the affidavit of *J. W.*, and any suggestion of a mistake is wholly inadmissible. In case of *bankruptcy*, a legal proceeding takes place, and the party is declared a bankrupt; and until he is so declared, the partnership continues. So in the case of *lunacy*, there must be an *inquisition of lunacy*, and an inquest found. The mere fact of lunacy does not, of itself, put an end to the partnership. In the case put, of an assignment of a partner's interest in the concern, suppose a debt contracted with the firm, without any knowledge of the assignment, will not the firm be liable? *Notice* of the fact, or of the dissolution, is essential.

2. The remittance of the bill of exchange, in this case, was innocent. The funds were already in the enemy's country; it was a direction to transfer them from the hands of one enemy to those of another. To remit *specie* would be very different. That could not be done without a direct trade. In the case of *Potts* v. *Bell*, the goods were purchased with a bill drawn in *England* on *Amsterdam*, yet the objection of its being illegal to draw such a bill, was never suggested.

Again; the government of the *United States* gave, at least, a tacit consent to our citizens to remit bills to *England*. There may be a *tacit*, as well as an express consent of the government. (*Puff.* b. 8. ch. 7. s. 16. *Barbeyrac's note.* 4 *Rob.* 195. 2 *Campb. N. P.* 44.) A license may be presumed. Though congress alone can declare war, yet the *conduct* of the war belongs to the executive of the nation. It is always a question of *state policy*, whether trade with the enemy is to be allowed. Our government certainly countenanced this intercourse; and courts of justice are not to pronounce on the *policy* of the measure.

Again; admitting that the transaction was unlawful during the war, the defendants, being fund holders, cannot set

up that illegality as a defence. (2 *Poth. Oblig.* translated by *Evans, notes,* p. 8—16.)

ALBANY,
January, 1818.

GRISWOLD
v.
WADDINGTON.

SPENCER, J. delivered the opinion of the court. This cause has given rise to several novel and important questions; and when the interesting results, growing out of these questions, are duly estimated, it is impossible to approach them without great solicitude and anxiety.

In considering this cause, I have found it unnecessary to decide some of the points which were ably discussed by the counsel; for having arrived at a satisfactory conclusion on one of them, which must be decisive as to the plaintiff's claim, I have considered it unnecessary to express any opinion on the others.

Upon the fullest reflection which I have been able to give to the subject, my opinion is, that the declaration of war between the *United States* and *Great Britain* produced a suspension during the war, or, *ipso facto,* a dissolution of the partnership previously existing between the defendants, so that the one is not responsible upon the contract, express or implied, of the other. It will be perceived that this proposition assumes the fact that the partnership between the defendants had not become dissolved by the efflux of time, or the acts of either of the partners, although this point is, in itself, very questionable. The better conclusion from the evidence is, that the partnership expired by its own limitation during the war; and the existence of the war would, at all events, dispense with the *public notice* which is, in general, necessary to the valid dissolution of a partnership.

The case discloses that the firm of *Henry Waddington & Co.* consisted of *Henry* and *Joshua Waddington;* that *Henry* is a *British* subject, resident, before and during the war, in *London,* conducting the partnership concerns there, whilst the defendant was resident here. The negotiations which gave rise to the present suit took place in *England,* and exclusively with *Henry Waddington,* during the late war between this country and *Great Britain.*

It was admitted on the argument, and so the fact undoubtedly is, that the proposition I have advanced is neither supported nor denied by any judicial decisions or elementary

writer of the common law ; but, if I mistake not, it is sup-
ported by the strongest reasons, and by necessary analogy
with adjudged cases.

The first inquiry is, what are the objects and ends of part-
nerships. They are entered into with the view, that, with
the joint funds, skill, and labour of the several partners, the
interests of the concern may be advanced and promoted.
There may be, and frequently are, different inducements
influencing each partner : one may have more capital and
credit ; another may have more skill, activity, and expe-
rience. The one may choose to be a dormant and inert
partner, furnishing an equivalent for the services and skill of
the other, and leaving the business entirely to his control
and management. But unexplained as this partnership is,
we must understand it to be, an union with a view to the em-
ployment of the joint capital, labour, and skill of both the
partners, for the purposes of internal and external commerce
between this country and *Great Britain.* That the object
of the partnership embraced both these objects of internal
and external trade, would seem to be unquestionable from
the local position of the partners.

That the death, insanity, and bankruptcy of one of the
partners operates as a dissolution, was not questioned in the
argument ; and a respectable elementary writer, Mr. *Watson,*
is of opinion that the *marriage* of a *feme sole* partner would
produce the same consequence. The cases of *Pearce* v.
*Chamberlain,* (2 *Ves.* 33.) and *Sayer* v. *Bennet,* (*Watson,*
382.) and several other cases cited by him, all go to esta-
blish the general principle, that death, insanity, and bank-
ruptcy, work a dissolution of partnerships ; and they pro-
ceed on the principle, that the other partners are not bound
to admit the representatives of a deceased or insane partner,
into the concern, the confidence having been originally
placed in the personal skill and assistance of those no longer
able to afford it.

. Let these principles be applied to the present case, and
it would seem that the same result is inevitable. In what
situation did the war put the defendants, as regarded each
other ? Most undeniably, the two nations, and all their citi-
zens, or subjects, became enemies of each other, and the

consequence of this hostility was, that all intercourse and <span style="float:right">ALBANY,</span>
communication between them became unlawful.   This is <span style="float:right">January, 1818.</span>
not only the acknowledged principle of the law of nations, <span style="float:right">GRISWOLD</span>
but is also a part of the municipal jurisprudence of every <span style="float:right">v.<br>WADDINGTON.</span>
country.   I need not cite cases in support of a posi-
tion, which has so repeatedly been recognised in the *Eng-
lish* courts, and in our own, possessing as well admiralty as
common law jurisdiction.   Another consequence of the war
was, that the shipments made by each of  the partners
would be liable to capture and condemnation, by the cruizers
of the government of the other ; and another very serious
evil attended them :  no debts contracted in the partnership
name could be recovered in the courts of either nation ;
they not having, in the language of the law, a *persona standi
in judicio*, whilst they were amenable to suits in the courts
of both nations.   (*The Hoop*, 1 *Rob.* 201.)   It is true, the
same disability to sue for debts due the firm antecedent to
the war, would exist.   This, however, does not weaken the
objection ; it remains still an important item, in considering
whether a partnership exists, when the new debts created
are to be liable to the same disability.   It appears, that
*Joshua Waddington* is a citizen of the *United States ;* and it
has been already mentioned that *Henry Waddington* is a
*British* born subject.   They owed different allegiances,
and it became part of their duty to lend all their aid, in a
vigorous prosecution of the war, the one to the *United
States*, and the other to *Great Britain ;* and, it appears to me,
that it would not comport with policy or morality, that the
law should imperiously continue a connection, when, by its
very continuance, it would afford such strong inducements
to a violation of that fidelity which each owes to his govern-
ment.

Again ; all communication and intercourse being render-
ed unlawful, and it being a well-established principle, that
either partner may, by his own act, dissolve a partnership,
unless restrained to continue it for a definite period, by
compact, in what manner could such intentions be manifest-
ed during the war ?  It might, indeed, be made known to the
public of one of the countries, but it could not be notified to
the public of the hostile country ; and thus, unless the war

ALBANY,
January, 1818.

GRISWOLD
v.
WADDINGTON.

produced a dissolution, he would be responsible, notwith-- standing he had the desire to dissolve the connection, mere- ly from inability to make known that determination ; an in- ability, produced by events utterly uncontrollable. When the objects and intentions of an union of two or more indi- viduals, to prosecute commercial business, are considered ; when it is seen that an event has taken place, without their fault, and beyond their control, which renders their respec- tive nations, and along with them, the defendants themselves, enemies of each other ; that all communication and inter- course has become unlawful ; that they can no longer co- operate in the conduct of their common business, by afford- ing each other advice, and are kept hoodwinked, as to the conduct of each other ; that the trade itself, in which they were engaged, has ceased to exist ; that if they enter into any contracts, they are incapable of enforcing their per- formance, by an appeal to the courts ; that their allegiance leads them to support opposite and conflicting interests ; I am compelled to say, that the law cannot be so unjust as to pronounce, that a partnership, so circumstanced, when all its objects and ends are prostrated, shall continue ; and, with the clearest conviction upon my mind, and in analogy to the cases to which reference has been made, I have come to the conclusion, that the partnership between the defend- ants was, at least, suspended, and I incline to the opinion, that it was, *ipso facto*, dissolved by the war, and, conse- quently, that the defendant, *J. W.*, is not liable to this action.

Much stress was placed upon an affidavit, made by the defendant, *Joshua Waddington*, in *March*, 1813, annexed to a petition presented to the district court, to obtain the re- mission of the forfeiture, incurred by the importation of goods from *England*, by *Joshua Waddington & Co.* in 1812, in which he states that *Henry Waddington* conducts the firm of *Henry Waddington & Co.* and that firm is composed of *Henry Waddington*, and the defendant ; and it has been in- sisted, that this is an admission of the existence of the firm at that time. It has not been shown, that *Joshua Waddington* has done any one act, as a partner, after the war ; and if the affi- davit amounts to an admission, it is a mistake of the law upon the subject, and does not affect him. It has not been

shown, that, in point of fact, the plaintiffs ever knew of this affidavit, or were misled by it. Had the defendant even promised to pay the demand claimed by the plaintiffs, if there was no prior liability, the promise would have been a *nudum pactum.* There is, however, strong reason to believe, from the evidence of Mr. *Ogden,* that the mistake in the law was entirely attributable to the hurry of the moment, and that it did not originate with *Joshua Waddington ;* but, I think, that the affidavit, construed in reference to the subject matter of it, does not mean to say that the partnership then existed, but that the goods belonged to that firm, when they were shipped, and when they arrived.

It has, too, been strongly put, that the plaintiffs contracted this debt with the firm, on the faith that *Joshua Waddington* was a partner, and that he ought to have publicly communicated the dissolution of the partnership. I am perfectly satisfied that *J. Waddington* has acted in good faith ; there is no pretence that he has done any thing to mislead the plaintiffs, or the public, unless his silence be so considered. If the law worked a suspension, or dissolution, of the partnership, every person dealing with *Henry Waddington* was bound to take notice of that fact; and, with the old dealers of the firm, there was knowledge of all the material facts, which enter into the determination of the cause.

Judgment for the defendant.