WILSON (LENOX v.). See Case No. 8,247.

## Case No. 17,817.
### WILSON v. LE ROY et al.
[1 Brock, 447.] [1]

Circuit Court, D. Virginia. June 7, 1820.

CHARTER PARTY — BLOCKADED PORT — EFFECT OF TAKING LICENSE FROM ENEMY — NEW CONTRACT.

1. A charter-party was entered into during the war between England and the United States, and during the blockade of the Chesapeake by the British fleet, by which the plaintiff let his ship to the defendants, to carry flour from Norfolk to Cadiz; and covenanted to deliver the flour, "excepting always restraints of princes and rulers;" and the freighters covenanted to pay the freight. The ship was provided with a Sidmouth license, but the charter-party does not express it; yet the fact was well known to the defendants, who, as well as the plaintiff, relied on the protection afforded by that license. The date of the charter-party, was the 31st of January, 1813. After the ship was loaded, it was ascertained that the license would afford no protection against the blockading squadron. The defendants, on the 3d of March, by letter, directed, that the ship should not proceed to sea under existing circumstances; on the 19th of June, they directed, that she should continue ready to prosecute the voyage as soon as the blockade should be raised; and, finally, in the January following, the blockade still continuing, they directed, that the flour should be delivered to their order, which was done. *Held*, that the procurement of the license, vitiates the contract as much as if it had been inserted in the charter-party.

2. Although freight cannot be recovered, yet the various directions given by the defendants amounted to a new contract, which may be enforced; and the ship owner was entitled to an equitable compensation for his labour, and the expenses incurred by him prior to the 3d of March; from that time, to the 19th of June; and after the last day, to January, 1814, when the flour was delivered by the plaintiff to the order of the defendants.

The plaintiff, George Wilson, in October, 1815, exhibited his bill against the defendants, Le Roy, Bayard & M'Iver, merchants, and residents of the state of New York, and against Moses Myers & Son, residents of Norfolk, in Virginia, who held in their hands effects of, and were otherwise indebted to, the said Le Roy, Bayard & M'Iver, in the chancery court held in Williamsburg, Virginia. At the May term, 1816, of that court, the cause, on the petition of the defendants, Le Roy & Co., was removed to this court, under the authority of the act of congress. In December, 1817, those defendants filed their answer, and the cause came on to be heard at the May term, 1820. The opinion of the court gives so full a view of the facts and circumstances of the case, that it is deemed unnecessary to give a farther statement.

MARSHALL, Circuit Justice. The bill states that, on the 21st of January, 1813, the plaintiff, being owner of the Woodrop Simms,

[1] [Reported by John W. Brockenbrough, Esq.]

chartered her to James Dykes & Co. agents for Robert Pollard, who was agent for Le Roy, Bayard & M'Iver, to carry a load of flour from Norfolk, to Cadiz, for a freight of $3, per barrel, and five per cent. primage. Having received a full cargo, 3,407 barrels, he was about to despatch her, when on the 3d of March, he received a letter from Dykes & Co. forbidding him on the part of Le Roy, Bayard & M'Iver, from sending her to sea, under existing circumstances, (meaning the blockade,) and if he did, he would be held responsible. This letter was answered on the same day, expressing his readiness to prosecute his voyage, but that he should conform to the instructions he had received, holding Le Roy, Bayard & M'Iver, answerable for freight, &c. The blockade still continuing, the plaintiff on the 17th of June, 1813, wrote to Robert Pollard, proposing to change the voyage of the ship, on terms which he expressed. Robert Pollard rejected these terms, and insisted on the ship's going to sea so soon as she could sail, without violating the blockade. The blockade still continuing, and the warm weather commencing, the plaintiff was compelled to land the flour. The blockade appearing to be as lasting as the war, the flour was kept in store, and the plaintiff offered to abandon the voyage, on being paid a sum which he thought a reasonable compensation for his trouble and expense. On the 11th day of January, 1814, he received a letter from Moses Myers & Son, as agents, demanding the flour, and proffering their own responsibility, to comply with the decision of a court, as to the quantum of compensation. The flour was delivered, and this suit brought. It is prayed that a master may be decreed to report, what sum is due, and that it may be paid. The charter-party lets the vessel, engages to receive the cargo to proceed with the first fair wind, and to deliver, &c. (excepting always "restraints of princes, and rulers,") for which the freighters covenant to pay, &c: the owner to allow 45 running days, for loading and delivery: and to receive demurrage at the rate of 10 guineas per day. The letter of 3d of March, 1813, forbidding Wilson to send the ship to sea, "under existing circumstances," was exhibited in evidence. The answer admits the contract, &c., but alleges, that before she proceeded to sea, the blockade commenced. The ship was provided with a Sidmouth license, but the blockade embraced such vessels, as well as others, which fact became notorious, by the sending back of such vessels.

Upon these facts, the plaintiff claims the full freight, as if the voyage had been performed, because he was stopped by the agent of the defendants, when ready to proceed upon it. If this be not allowed, then he claims compensation for his labour and expenses, performed and incurred at the request, and by the direction of the defendants. The defendants insist, that they are responsible for

nothing: that the plaintiff has not entitled himself to freight, because the voyage was not even commenced: and because, the whole contract was rendered so illegal, by the British license, with which the ship was furnished, that neither party can recover under it. The Woodrop Simms was furnished with a license, granted by the British government, then at war with the United States, to protect her in the voyage, mentioned in the charter-party. It is not denied, that if, by contract, Wilson had expressly stipulated, that the vessel should sail under the protection of such a license, the charter-party would have been vitiated, and the plaintiff would have been incapable of recovering on it.[2] But it is

[2] See Patton v. Nicholson, 3 Wheat. [16 U. S.] 204. Action of assumpsit for $750, for the sale of a certain paper, called a sawyer's license, to which the defendant pleaded non-assumpsit. Evidence offered to the jury, to show, that both parties were citizens of the United States, and that the license was sold by the plaintiff, to the defendant, in Alexandria, D. C., to be used for the protection of the schooner Brothers, an American vessel, during the war, against enemy's vessels, on a voyage from Alexandria, to St. Bartholomews, to be cleared out for Porto Rico. Marshall, C. J., said, that the opinion of the court was, that the use of a license or pass, from the enemy, by a citizen, being unlawful, one citizen had no right to purchase of, or sell to, another, such a license, or pass, to be used on board an American vessel. "In the several cases during the late war, of The Julia, 8 Cranch [12 U. S.] 181; The Aurora, Id. 203; The Hiram, Id. 444, 1 Wheat. [14 U. S.] 440; and The Ariadne, 2 Wheat. [15 U. S.] 143,—the court determined, that the use of a license, or passport of protection, from the enemy, constitutes an act of illegality, which subjects the property sailing under it, to confiscation in the prize court. The act of the 2d Aug 1813, c. 585 [Colvin's Laws], and of 6th July, 1812, c. 452, § 7 [Colvin's Laws], prohibiting the use of licenses, or passes, granted by the authority of the government of the United Kingdom of Great Britain and Ireland, repealed by the act of 3d March, 1815, c. 766, were merely cumulative upon the pre-existing law of war. The Saunders [Case No. 12,372]. It follows, as a corollary from this principle, that a contract for the purchase or sale, of such a license is void, as being founded upon an illegal consideration. That no contract whatever, founded upon such a consideration, can be enforced in a court of justice, is a doctrine familiar to our jurisprudence, and was, also, the rule of the civil law. It is upon the same principle, that every contract, whether of sale, insurance, or partnership, or growing out of a commercial intercourse, or trading with the enemy, is void. Thus, it has been held by the supreme court of New York, that a partnership, between persons, residing in two different countries, for commercial purposes, is, at least, suspended, if not ipso facto determined, by the breaking out of war between those countries; and that, if such partnership expire by its own limitation, during the war, the existence of the war, dispenses with the necessity of giving public notice of the dissolution. Griswold v. Waddington, 15 Johns. 57." Mr. Wheaton's note (a) to Patton v. Nicholson, supra. A vessel and cargo, which is liable to capture, as enemy's property, or for sailing under the pass, or license of the enemy, or for trading with the enemy, may be seized, after her arrival, in a port of the United States, and condemned as prize of war. The delictum is not purged, by the termination of the voyage. The Caledonian, 4 Wheat. [17 U. S.] 100.

insisted, that the fact of the license being on board, did not contaminate the charter-party, which contains no stipulation respecting it, nor annul the contract of which it is not an ingredient; the more especially as the voyage had not commenced, and the owner of the vessel might have parted with the license before she sailed.

This argument assumes a fact upon which its whole force depends. It is, that the license was not an ingredient in this contract. It is true, it is not mentioned in the charter-party. But if the consideration be contrary to law, it is not necessary that such illegal consideration should be expressed in the instrument. It may be pleaded and shown in evidence. That this Sidmouth license did form an ingredient in the contract, that the plaintiff would have failed in his engagement, and, supposing the contract to sail under the protection of a license to be legal, would have been responsible in damages, had his vessel sailed without such protection during the war, is, I think, satisfactorily proved. The contract itself, and the circumstances under which it was made, would go far in preparing us to believe the well and mutually understood views of the parties. I will not undertake to say what influence this mutual understanding might have been entitled to, had it not been communicated by the parties to each other; but if it was communicated, if the plaintiff declared, that his vessel was furnished with such a license, and the defendants chartered her on that declaration, the plaintiff was bound to make his vessel such as he described her to be, at least, so long as the license was material. I think the testimony shows, that these reciprocal communications were made by the parties. The defendants were about to make a voyage which required a British license, and a license for a particular port. They would, of course, inquire for a vessel ·furnished with such a license, and their inquiries would be answered, by any person disposed to make the contract, that his vessel was so furnished.

The letter from Robert Pollard to James Dykes & Co., authorizing the transaction on the part of his friends in New York, dated January 25th, 1813, contains these expressions: "I will thank you to charter a good vessel that will take from 3500 to 4000 barrels for Cadiz, if practicable, at a rate not higher than $2.75 a $3 per barrel, having a Sidmouth license; but if this cannot be done, to take up one for Lisbon, having such a license." In a letter, dated the 30th of the same month, James Dykes & Co., referring to a previous letter, say, "Dickson lately failed in exchanging his Sidmouth license to Lisbon, for one to Cadiz; in consequence, we have chartered the 'Woodrop Simms,' to load flour for you to Cadiz, at $3 per barrel, &c. Her Sidmouth is dated the middle of August, which made her owner, Mr. George Wilson, very tenacious about time." The charter-party is dated the 31st of January, and is executed by James Dykes & Co., for Robert Pollard, agent for Le Roy, Bayard & M'Iver. Wilson, therefore, must be supposed cognizant of the authority, under which Dykes & Co. acted; and that authority contains the instruction to charter a vessel, furnished with a Sidmouth license, for Cadiz. These papers, with the circumstances under which the contract was made, circumstances which, in themselves, are testimony never to be disregarded, prove, I think, that the possession of the Sidmouth license, was communicated, and was the inducement to the contract. If so, it has the same influence, as if it had been mentioned in the charter-party, so long as it was on board, and as it was material that it should be on board.

It has been insisted for the plaintiff, that, admitting the testimony to prove the fact, it is not alleged in the pleadings, and the proof must, therefore, be disregarded. It is undoubtedly true, that a decree must be according to the allegations, as well as the proofs in the cause; but it is not necessary, that every circumstance attending a general fact, should be minutely alleged. In this case, the defendants say that the vessel was provided with a Sidmouth license, but do not aver, that this license formed an ingredient in the contract. If I should be of opinion, that the defendants could not, on this account, avail themselves of this defence, and that, in consequence thereof, the plaintiff would be allowed to claim the whole freight agreed on in the charter-party, so that the real justice of the cause would be defeated, I would certainly permit them to amend their answer on equitable terms; but not to amend it, so as to defeat the justice of the case. But I do not now think this part of the case material, because the blockade, having been imposed and declared, after the charter-party was signed, I do not think, the letter of the 3d of March, 1813, gave Wilson any right to claim freight, on the principle, that the voyage was arrested by Le Roy, Bayard & M'Iver. The blockade justified their interference. And as the voyage was never made, and the freight never earned, the owner of the vessel cannot recover on the charter-party, whether the parties to that instrument were bound by it or not. But as the view I take of the effect of the charter-party, has some influence on those circumstances, on which the decision of this court may depend, I will observe, that in that contract there was nothing morally wrong. The George [Case No. 5,327]. It is annulled by the law, upon principles of policy; and this operation of the law upon it, was unknown to the best informed among us, until the decision was made in the supreme court of the United States. See cases cited in note [supra]. The parties, therefore, are, in fact, innocent. The contract was made with a belief that it was valid, and, therefore, I think, that although it could not have been enforced, it will not infect and vitiate any other contract between the parties. On the 3d of March, the defendants forbade the "Woodrop Simms" to proceed to sea, and afterwards, on the 19th of June, she was or-

dered by them, to continue ready to prosecute the voyage, so soon as the blockade should be removed, which, the letter says, was daily expected. The expenses, then, which were incurred, and the services which were rendered, perhaps, from the 3d of March, certainly from the 19th of June, were incurred and rendered by the direction of the defendants. Had the defendants, on understanding that the license would not protect the Woodrop Simms, from the effect of the blockade, allowed her owner to land his cargo, he might have employed his vessel, perhaps, in the bay navigation; certainly he would have been liberated from all the extra expenses of retaining his vessel in a state of preparation for sea.

While things were in this uncertain state, a proposition was made by Wilson, to vacate the contract, and abandon the voyage, on certain terms, which are stated generally, but as the proposition itself, is not before the court, they cannot be particularly stated. This proposition was not accepted, but afterwards, on the 11th day of January, 1814, a proposition to abandon the voyage, was made on the part of the defendants, who demanded the delivery of the flour, offering to abide by the decision of a court. On this letter, the flour was delivered, and upon this part of the transaction, the claim of the plaintiff, in my opinion, rests. He was in possession of the cargo, and had a right to hold that possession until he could perform his voyage. Whether he performed this voyage, with or without the license, he could have retained the flour at Cadiz, until the freight was paid. If the blockade should be of equal continuance with the war, he might at the expiration of the war, have made the voyage without the license; and I am not prepared to say, that in that case he might not have recovered the stipulated freight, even on the charter-party. In the mean time, the cargo might be, and, probably, would have been, totally lost to the defendants. These advantages were given up with the flour. It could not have been expected by either party, that they should have been given up for nothing. The fair construction then of the contract, under which the flour was restored to the defendants, is, I think, that some equitable compensation should be made, with a view to all the circumstances of the case. This is rather a fit subject for the consideration of the parties themselves, or of friendly arbiters, than of a court. It is a case of hardship, and of loss on both. Each ought to concede something. If the court must decide it, I am not certain what will be my ultimate decision, but I shall now direct an account to be taken, of the expenses incurred by Wilson, from the date of the charter party, to the time of restoring the flour, stating separately those which were incurred, in taking the cargo on board, and prior to March 3d, 1813, those which were incurred between the 3d of March, and 19th of June, and those which were incurred after the 19th of June. In addition to this report, I could wish to be informed how cases of this character have been generally settled by the parties.

June 7th, 1820, the order of the court was as follows: "This cause came on, &c. On consideration whereof, the court doth direct an account to be taken by one of its commissioners, of the expenses incurred by the plaintiff, from the date of the charter party, in the proceedings mentioned, to the time of restoring the flour, the cargo of the Woodrop Simms, by the plaintiff, to the defendants Moses Myers & Son, stating separately those which were incurred in taking the cargo on board, and to the 3d March, 1813, those which were incurred between the 3d March, and the 19th June, 1813, and those incurred after the said 19th June, which account he is directed to report to the court, &c." In obedience to this order, Commissioner John Cowper, made a report of the expenses incurred by the plaintiff, during the three periods specified in the order. The expenses incurred from the date of the charter-party, to the 3d March, amounted to $1943 24 cents. This however included "the cost of a Sidmouth license, $1000:" those incurred for the second period, amounted to $633 50 cents: and those after the 19th June, to $359 52 cents, making the aggregate sum of $2936 26 cents, principal. He also calculated the interest on those respective sums, from the 3d March, the 19th June, and 31st July, 1813, to 3d December, 1820, the time of the report, making an aggregate of principal and interest of $4281 98 cents. The court rejected the charge for the Sidmouth license, and the interest on it amounting to $1465, and rendered a decree for the balance.

9th June, 1821, MARSHALL, Circuit Justice, without expressing any further opinion, directed the following decree to be entered: "This cause came on to be finally heard on the papers formerly read, and on the report of the commissioner, and was argued by counsel. On consideration whereof, the court, disapproving of so much of the report, as allows one thousand dollars for the Sidmouth license, with interest thereon, and approving the residue thereof, doth adjudge, order, and decree that the defendants do pay to the plaintiff, the sum of two thousand, eight hundred and sixteen dollars, ninety five cents, and his costs by him about his suit in this behalf expended."